400 So.2d 1220 (1981)
THE FLORIDA BAR, Complainant,
v.
Benny R.S. HARRIS, Respondent.
No. 59184.
Supreme Court of Florida.
July 9, 1981.
David G. McGunegle, Branch Staff Counsel, Orlando, and John A. Boggs, Asst. Staff Counsel, Tallahassee, for complainant.
E.G. Musleh, Ocala, for respondent.
PER CURIAM.
This disciplinary proceeding by The Florida Bar against Benny R.S. Harris, is before us on a petition for review of the report of the referee. The referee's report and record have been filed with this Court pursuant to Fla.Bar Integr.Rule, article XI, Rule 11.06(9)(b). We have jurisdiction. Art. V, § 15, Fla. Const.
The referee's findings of fact are as follows:
A. (05A79C03)

1. Respondent was a member of The Florida Bar at the time pertinent to the matters alleged in the Complaint filed in this proceeding.
2. Respondent maintained two trust accounts (one in Gainesville and one in Ocala, Florida) from November, 1977 until some time in 1979. During that period of time he wrote checks on said trust accounts when there were insufficient funds in the account or accounts to cover the amount of the checks. Respondent, according to a Bar Audit conducted January, 1980, overdrew the Ocala trust account 51 times. The trust account records were not kept in accordance with appropriate rules governing trust accounts, and trust funds belong to clients were co-mingled with other clients' funds and with personal funds of Respondent.
3. Respondent executed FY 1978 and 1978 "Dues Statement" indicating he had read the appropriate rules governing *1221 trust accounts and that he was in substantial compliance. Such statement was false according to his admissions and the audit and the auditor's testimony (the auditor's testimony is contained in the recorded transcript of the Grievance Committee Hearing which was admitted into evidence by stipulation of counsel).
B. (05A79C15)

1. Respondent collected $4,000 settlement for his client, Boyle. He deposited it in his trust account on October 12, 1978.
2. After deducting his fee, Respondent issued a postdated check to his client for her portion of the settlement.
3. At the time the check was issued, there were insufficient funds and there were insufficient funds to cover the postdated check the following day, October 13, 1978, the date on the check.
4. The client did receive funds equal to the amount of the check by a cashier's check delivered to her after her complaint concurring [sic] the insufficient funds. However, said sum was not obtained from the trust funds that were initially placed there the 12th day of October, 1978.
C. (05A79C17)

1. Respondent collected a workmen's compensation settlement for his client, McBride, and he signed the client's name and his name on the draft.
2. The amount collected for the client was $3,000, which Respondent failed to process through his trust account.
3. Respondent paid some of the clients' funds to his client, in cash, and the client claims Respondent still owes him a disputed amount.
4. Respondent claims he had paid his client, in cash, "in full", but he submitted no proof of such to the Referee. In fact, Respondent agreed to pay the amount claimed by his client in the very near future.
D. (05A79C24)

1. Respondent collected a $5,000 settlement for his client, Jones. $3,000 of the total was due the client.
2. The money was collected by Respondent in February, 1979.
3. Respondent paid $1,000 of the $3,000 due his client, but failed to pay the client the additional $2,000 until after the Grievance Committee Hearing held April 26, 1979. There was no evidence that any of such sums were paid into or out of any trust account of Respondent.
E. (05A79C30)

1. Respondent collected $5,750 in a settlement for his client, Hefflin, in the early part of 1979.
2. The client's share of the proceeds was $3,045.90.
3. Respondent failed to pay his client her share. He failed to place it in a trust account or the registry of the court, but used the funds for his personal benefit.
F. (05A80C01)

1. Respondent received $27,427 due his client, Patterson, which represented her portion of her father's estate.
2. Respondent opened a new trust account and deposited the above funds in it on April 26, 1979.
3. Respondent never paid the client any of those funds, but converted the funds to his own use.
4. By May 1, 1979, the total amount of funds in the above trust account was $5,299.02. The account continued to decline, and by August, 1979, the account was closed.
5. After several requests by the client for her money, Respondent consulted with his client and acknowledged that he was indebted to her for the funds. He gave his client two postdated checks and admitted the funds were not available at the time the checks were given.
6. An attempt by Respondent's client to cash her checks was without benefit to her because of insufficient funds.
7. Respondent used the entire $27,427 for his own benefit and without the consent of his client.
The referee then recommended that respondent be found guilty of each count of the complaints. He then recommended that respondent *1222 be suspended from the practice of law for thirty-six months and continuously thereafter until he has made satisfactory restitution, paid all costs of this proceeding, and until he demonstrates to the Board of Governors of The Florida Bar and to the Supreme Court of Florida that he is entitled to be reinstated in the practice of law by successfully passing the bar examination subsequent to his thirty-six month suspension.
It is evident from the findings of the referee that respondent has engaged in a continuing and irresponsible pattern of conversion of clients' trust funds to his own use, failure to account for clients' trust funds and failure to maintain trust records. Respondent's actions demonstrate an attitude wholly inconsistent with the high professional standards of the legal profession. We feel that under these circumstances, the penalty of disbarment is more appropriate than the suspension recommended by the referee.
We discussed the purposes of discipline in The Florida Bar v. Pahules, 233 So.2d 130, 132 (Fla. 1970):
[T]hree purposes [of discipline] must be kept in mind in reaching our conclusions. First, the judgment must be fair to society, both in terms of protecting the public from unethical conduct and at the same time not denying the public the services of a qualified lawyer as a result of undue harshness in imposing penalty. Second, the judgment must be fair to the respondent, being sufficient to punish a breach of ethics and at the same time encourage reformation and rehabilitation. Third, the judgment must be severe enough to deter others who might be prone or tempted to become involved in like violations.
We feel that in this situation the purposes of discipline, as set forth in Pahules will be met by disbarment.
Other cases similar to the case at bar include The Florida Bar v. Bassett, 369 So.2d 583 (Fla. 1979) (disbarment warranted in view of seven separate probable cause cases involving allegations of blatant misuse of clients' trust funds); The Florida Bar v. Duffy, 369 So.2d 344 (Fla. 1979) (misappropriation of trust funds warranted disbarment); and The Florida Bar v. Mattingly, 342 So.2d 508 (Fla. 1977) (improper transfers from client's trust account, resulting in shortages, warranted disbarment). Considering these similar cases and considering our pronouncement in The Florida Bar v. Breed, 378 So.2d 783 (Fla. 1979), that we would not be reluctant to disbar an attorney for commingling, misuse, and misappropriation of clients' funds, it is the order of this Court that this disbarment be effective thirty days after the filing of this order, thereby giving respondent thirty days to close out his practice and take the necessary steps to protect his clients. It is further ordered that respondent shall not accept any new business, and that all costs of these proceedings be charged to the respondent in the amount of $1,636.40.
ADKINS, Acting C.J., and BOYD, OVERTON, ENGLAND and ALDERMAN, JJ., concur.